# Exhibit A

1  ROBBINS ARROYO LLP
   BRIAN J. ROBBINS (190264)
2  STEPHEN J. ODDO (174828)
   ERIC M. CARRINO (310765)
3  600 B Street, Suite 1900
   San Diego, CA 92101
4  Telephone: (619) 525-3990
   Facsimile: (619) 525-3991
5  E-mail: brobbins@robbinsarroyo.com
           soddo@robbinsarroyo.com
6          ecarrino@robbinsarroyo.com

7  Attorneys for Plaintiff



F I L E D
SAN MATEO COUNTY

OCT - 6 2017

Clerk of the Superior Court
By _____
DEPUTY CLERK

8          SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                      COUNTY OF SAN MATEO

10  VLADIMIR GOLOSIY, Individually and on     ) Case No.  17CIV04618
    Behalf of All Others Similarly Situated,   )
11                                             ) CLASS ACTION
                      Plaintiff,               )
12                                             ) COMPLAINT FOR VIOLATIONS OF THE
           v.                                  ) SECURITIES ACT OF 1933
13  TINTRI, INC.,                              )
    KEN KLEIN,                                 )
14  KIERAN HARTY,                              )
    IAN HALIFAX,                               )
15  PETER SONSINI,                             )
    ADAM GROSSER,                              )
16  CHRISTOPHER SCHAEPE,                       )
    HARVEY JONES,                              )
17  JOHN BOLGER,                               )
    CHARLES GIANCARLO,                         )
18  NEW ENTERPRISE ASSOCIATES 12,              )
      LIMITED PARTNERSHIP,                     )
19  NEA PARTNERS 12, LIMITED                   )
    PARTNERSHIP,                               )
20  NEA 12 GP, LLC,                            )
    SILVER LAKE GROUP, L.L.C.,                 )
21  SILVER LAKE KRAFTWERK FUND, L.P.,          )
    SILVER LAKE TECHNOLOGY                     )
22    ASSOCIATES KRAFTWERK, L.P.,              )
    MORGAN STANLEY & CO. LLC,                  )
23  MERRILL LYNCH, PIERCE, FENNER &            )
      SMITH INCORPORATED,                      )
24  KEYBANC CAPITAL MARKETS INC.,              )
    NEEDHAM & COMPANY, LLC,                    )
25  PIPER JAFFRAY & CO.,                       )
    RAYMOND JAMES & ASSOCIATES, INC.,          )
26  WILLIAM BLAIR & COMPANY, L.L.C.,           )
    and DOES 1-25, Inclusive,                  )
27                                             )
                      Defendants.              ) DEMAND FOR JURY TRIAL
28  _____   )

17-CIV-04618
CMP
Complaint
752931

**INTRODUCTION**

1.      Plaintiff, individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by defendant Tintri, Inc. ("Tintri" or the "Company"), as well as media and analyst reports about the Company and Company press releases.    Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein.

**SUMMARY OF THE ACTION**

2.      Plaintiff brings this securities class action on behalf of all persons who purchased or otherwise acquired Tintri stock pursuant or traceable to Tintri's June 30, 2017 initial public stock offering (the "IPO").  This action pursues remedies under the Securities Act of 1933 (the "Securities Act").

**JURISDICTION AND VENUE**

3.      This Court has subject matter jurisdiction over this action pursuant to the California Constitution, Article VI, section 10, and section 22 of the Securities Act, 15 U.S.C. §77v.  This action is not removable.  The claims alleged herein arise under sections 11, 12(a)(2), and 15 of the Securities Act.  *See* 15 U.S.C. §§77k, 77l(a)(2), and 77o.  Section 22 of the Securities Act, 15 U.S.C. §77v, expressly states that "[e]xcept as provided in section [16(c)], no case arising under this subchapter and brought in any State court of competent jurisdiction shall be removed to any court of the United States."  Section 16(c) refers to "covered class action[s] brought in any State court involving a covered security, as set forth in subsection (b);" and subsection (b) of section 16 in turn includes within its scope only covered class actions "based upon the statutory or common law of any State or subdivision thereof."  *See* 15 U.S.C. §77p.  This is an action asserting only federal law claims.  Thus, this action is not removable to federal court.

4.     The violations of law complained of herein occurred in California and in large part in this county.  More, the Individual Defendants (as defined herein) reside in San Mateo County than any other location.  Defendants Klein, Bolger, Giancarlo, Grosser, and Sonsini (as defined herein) reside in San Mateo County, the Venture Capital Defendants (as defined herein) operate out of their offices in San Mateo County, and each of the Underwriter Defendants (as defined herein) has a sizable San Mateo County practice and maintains substantial and continuous contact with California by conducting significant investment banking operations in this county and throughout this state.

## PARTIES

**Plaintiff**

5.     Plaintiff Vladimir Golosiy purchased Tintri stock pursuant or traceable to the IPO and was damaged thereby.

**Defendants**

6.     Defendant Tintri is a Delaware corporation with principal executive offices located at 303 Ravendale Drive, Mountain View, California.  Tintri develops and markets an enterprise cloud platform combining cloud management software technology and a range of all-flash storage systems for virtualized and cloud environments.  As of April 30, 2017, Tintri had a total of 561 employees.

7.     Defendant Ken Klein ("Klein") is Tintri's Chief Executive Officer ("CEO") and the Chairman of the Board of Directors (the "Board") and has been since October 2013 and a director and has been since January 2012.

8.     Defendant Kieran Harty ("Harty") a Tintri co-founder, is Tintri's Chief Technology Officer and has been since October 2013 and a director and has been since August 2008.  Defendant Harty was also Tintri's CEO and the Chairman of the Board from June 2008 to October 2013.

9.     Defendant Ian Halifax ("Halifax") is Tintri's Chief Financial Officer and has been since December 2013.

- 2 -

10.    Defendant Peter Sonsini ("Sonsini") is a Tintri director and has been since 2008. Defendant Sonsini is also a General Partner at New Enterprise Associates, the venture capital firm, which controls the NEA Defendants (as defined herein), and has been since 2012.

11.    Defendant Adam Grosser ("Grosser") is a Tintri director and has been since July 2015. Defendant Grosser is also a Group Head and Managing Director at Silver Lake Kraftwerk, a division of the venture capital firm which controls the Silver Lake Defendants (as defined herein), and has been since February 2011.

12.    Defendant Christopher Schaepe is a Tintri director and has been since July 2009.

13.    Defendant Harvey Jones is a Tintri director and has been since March 2014.

14.    Defendant John Bolger ("Bolger") is a Tintri director and has been since December 2015.

15.    Defendant Charles Giancarlo ("Giancarlo") was a Tintri director from September 2016 to August 2017.

16.    The defendants named in ¶¶7-15 are referred to herein as the "Individual Defendants." The Individual Defendants each signed the Registration Statement, solicited the investing public to purchase securities issued pursuant thereto, hired and assisted the underwriters, planned and contributed to the IPO and Registration Statement, and/or attended roadshows and other promotions to meet with and present favorable information to potential Tintri investors, all motivated by their own and the Company's financial interests.

17.    Defendants New Enterprise Associates 12, Limited Partnership, NEA Partners 12, Limited Partnership, and NEA 12 GP, LLC (collectively, the "NEA Defendants") are part of New Enterprise Associates, a venture capital firm that invested in Tintri prior to the IPO. At the time of the IPO, the NEA Defendants beneficially owned approximately 5.3 million shares of Tintri, or over 23% of the Company's common stock, making them the largest stockholders of the Company at the time of the IPO.

18.    Defendants Silver Lake Group, L.L.C., Silver Lake Kraftwerk Fund, L.P., and Silver Lake Technology Associates Kraftwerk, L.P. (collectively, the "Silver Lake Defendants")

- 3 -

1 are part of a venture capital firm that invested in Tintri prior to the IPO. At the time of the IPO,

2 the Silver Lake Defendants owned over 4.5 million shares of Tintri, or approximately 21% of the

3 Company's common stock, making them the second largest stockholders of the Company at the

4 time of the IPO.

5       19.    The NEA Defendants and Silver Lake Defendants are collectively referred to

6 herein as the "Venture Capital Defendants."

7       20.    Defendant Morgan Stanley & Co. LLC served as an underwriter to Tintri in

8 connection with the IPO.

9       21.    Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated served as an

10 underwriter to Tintri in connection with the IPO.

11       22.    Defendant KeyBanc Capital Markets Inc. served as an underwriter to Tintri in

12 connection with the IPO.

13       23.    Defendant Needham & Company, LLC served as an underwriter to Tintri in

14 connection with the IPO.

15       24.    Defendant Piper Jaffray & Co. served as an underwriter to Tintri in connection

16 with the IPO.

17       25.    Defendant Raymond James & Associates, Inc. served as an underwriter to Tintri

18 in connection with the IPO.

19       26.    Defendant William Blair & Company, L.L.C. served as an underwriter to Tintri in

20 connection with the IPO.

21       27.    The defendants named in ¶¶20-26 are referred to herein as the "Underwriter

22 Defendants."

23       28.    The true names and capacities of defendants sued herein under C.C.P. section 474

24 as Does 1 through 25, inclusive, are presently not known to plaintiff, who therefore sues these

25 defendants by such fictitious names. Plaintiff will seek to amend this complaint and include

26 these Doe defendants' true names and capacities when they are ascertained. Each of the

27

28

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1    fictitiously named defendants is responsible in some manner for the conduct alleged herein and

2    for the injuries suffered by the Class (as defined herein).

3    <u>**SUBSTANTIVE ALLEGATIONS**</u>

4    29.    Tintri develops and markets an enterprise cloud platform combining cloud

5    management software technology and a range of all-flash storage systems for virtualized and

6    cloud environments in the United States and internationally.

7    30.    On June 1, 2017, Tintri filed its Registration Statement on Form S-1 with the

8    SEC. The SEC would declare the Registration Statement, as amended, effective. The Company

9    filed its Form 424B4 Prospectus with the SEC on June 30, 2017.

10    31.    On July 6, 2017, the Company and the Underwriter Defendants sold 8,572,000

11    shares of Tintri common stock to the investing public at $7 per share. They sold another

12    1,000,000 shares at a second closing on August 1, 2017, raising an additional $7 million in gross

13    proceeds pursuant to the Underwriter Defendants' greenshoe clause with the Company.

14    32.    The Registration Statement was negligently prepared and, as a result, continued

15    untrue statements of material facts or omitted to state other facts necessary to make the

16    statements made not misleading, and was not prepared in accordance with the rules and

17    regulations governing its preparation.

18    33.    Pursuant to Item 303 of Regulation S-K, 17 C.F.R. §229.303, and the SEC's

19    related interpretive releases thereto, issuers are required to disclose events or uncertainties,

20    including any known trends, that have had or are reasonably likely to cause the registrant's

21    financial information not to be indicative of future operating results. At the time of the IPO,

22    unbeknownst to investors, Tintri was experiencing upheaval in its sales organization. The

23    adverse events and uncertainties associated with these negative trends were reasonably likely to

24    have a material impact on Tintri's profitability, and, therefore, were required to be disclosed in

25    the Registration Statement, but were not.

26    34.    In the Prospectus, the Company highlighted its growth story. In particular, Tintri

27    stated that it experienced rapid growth and that its top twenty-five long-term customers

28

1   cumulatively have ordered more than nineteen times the amount they ordered in their first

2   quarter as customers and the Company planned "to continue to focus on acquiring customers and

3   maximizing their lifetime value through [its] demonstrated land and expand strategy."

4       35.    The Registration Statement explained that the Company has "experienced rapid

5   revenue growth resulting from the sales of [its] products and related support and maintenance

6   offerings."   The Prospectus addressed the "significant revenue growth" the Company was

7   experiencing, stating:

> We have experienced significant revenue growth, with revenue increasing from
> $49.8 million in fiscal 2015 to $86.0 million in fiscal 2016 and to $125.1 million
> in fiscal 2017, representing year-over-year growth of 73 "a and a 45%, respectively,
> for our two most recent fiscal years. Our revenue increased from $22.9 million in
> the three months ended April 30, 2016 to $30.4 million in the three months ended
> April 30, 2017, representing period-over—period growth of 33%. Our net loss
> was $69.7 million, $101.0 million, and $105.8 million in fiscal 2015, 2016, and
> 2017, respectively, and $30.8 million and $30.7 million in the three months ended
> April 30, 2016 and 2017, respectively. We have funded our activities primarily
> through debt and equity financings. As of April 30, 2017, we had an accumulated
> deficit of $376.0 million.

15      36.    The Prospectus further stated that after the IPO Tintri growth strategy would be:

**Our Growth Strategy**

> We intend to extend our position as a leader in providing enterprise cloud
> solutions to large organizations and CSPs. Key elements of our growth
> strategy include:
>
> • *Extend Our Differentiation in Enterprise Cloud through Continued
> Software Innovation*. We plan to continue to invest in enhancing our
> CONNECT architecture and our enterprise cloud platform, and extending
> our portfolio of software products, thereby driving cross selling and attach
> rates.
>
> • *Pursue Additional Large Organizations and CSPs*. We intend to
> continue our sales efforts to further penetrate the Global 2000 enterprises
> and CSPs with the most demanding workloads and complex cloud
> requirements.
>
> • *Leverage Line of Business Buyers to Accelerate Adoption*. We intend to
> continue to focus on selling to line of business buyers, who generally have
> their own IT budgets, and leverage those relationships to sell more broadly
> within their organizations.

- 6 -

○ *Increase Sales to Installed Base.* We intend to continue expanding our footprint with our existing customers by supporting additional use cases and selling additional software products. These additional use cases include data protection and disaster recovery, to expand our total addressable market.

• *Expand Sales and Marketing Presence in New and Existing Markets.* We plan to expand our presence in both existing and new markets, including territories in the Middle East, Asia and Europe.

○ *Support Value-Add Channel Partners.* We expect to focus our efforts on supporting those partners offering cloud services, including infrastructure "stacks" that include our solutions.

• *Expand and Deepen Technology Partnerships and Integrations.* We intend to expand and deepen our relationships with leading technology companies. We expect to continue to work closely with our partners to achieve certifications and integrations as well as to seek additional partnerships that will allow us to address new customer use cases and deployments.

37.   The Prospectus detailed the Company's competitive strengths, stating:

• *Our Customers Purchase Our Software Products Incrementally.* Our customers may buy software products incrementally or as part of a suite on an as—needed basis and tailor their solutions to their specific enterprise environment requirements. We believe that by offering our customers this flexibility, we provide them with differentiated value, thereby enabling us to drive incremental product sales.

\* \* \*

• *We Successfully Sell Enterprise Cloud to Large Organizations and CSPs.* We sell to a growing list of large organizations and CSP customers. Our value proposition to these customers is particularly compelling given that these organizations have large data centers with complex requirements and can benefit the most from self-service, automated workflows, predictive analytics and guaranteed application performance through autonomous operation.

38.   The Prospectus states that the Company's "sales teams have become more productive" and that "ramped teams, which we define as sales teams who have been in their roles for more than 180 days, have increased from 34 as of January 31, 2015, to 52 as of January 31, 2016, to 54 as of January 31, 2017, to 56 as of April 30, 2017."

39.     Concerning the employment of Michael McGuire, the Company's Chief Sales Officer, the Registration Statement stated:

**Michael McGuire Offer Letter**

In 2015, we entered into an offer letter with Michael McGuire, our Chief Sales Officer. The offer letter has no specific term and provides for at will employment. Mr. McGuire's current annual base salary is $350,000, and his current annual on—target incentive compensation opportunity is $350,000. Pursuant to the terms of his offer letter, Mr. McGuire received an option to purchase shares of our common stock, the material terms of which are described in the "Fiscal 2017 Outstanding Equity Awards at Year-End" table. Mr. McGuire agreed to forfeit his rights to the severance and change of control benefits under his offer letter in exchange for the right to receive severance and change of control benefits under our Executive Change of Control and Severance Policy, as more fully described in "Executive Employment Arrangements—Potential Payments upon Termination or Change of Control."

**Potential Payments upon Termination or Change of Control**

We adopted an Executive Change of Control and Severance Policy, or the policy, for Mr. McGuire and certain other executive officers (other than Mr. Klein and Mr. Halifax) and key employees, or participants. Under the policy, if we terminate Mr. McGuire other than for "cause," death or "disability" or he resigns for "good reason", in each case, during the period from three months prior to until twelve months following a "change of control" (for the purposes of this section "— Potential Payments Upon Termination or Change of Control," the "change of control period") (such terms are defined in the policy), he will be eligible to receive the following severance benefits (less applicable tax withholdings): (i) a lump sum cash amount equal to twelve months of his then—current annual base salary (or in the case that he resigns for good reason based on a material reduction in base salary and if greater, the annual base salary in effect prior to such reduction) or if greater, at the level in effect immediately before the change of control; (ii) 100% of his then outstanding and unvested equity awards will become fully vested and exercisable, if applicable, and any applicable performance goals will be deemed achieved at 100% of target levels; (iii) a lump sum cash amount equal to 100% of his target annual bonus opportunity in effect for the fiscal year in which the termination occurs; and (iv) payment or reimbursement of continued health coverage for him and his dependents under COBRA for a period of up to twelve months, or a taxable lump sum payment in lieu of such payment or reimbursement, as applicable.

Further, under the policy, if Mr. McGuire is terminated other than for cause, death or disability any time other than during the change of control period, he will be eligible to receive the following severance benefits (less applicable tax withholding): (i) continuation of his then—current annual base salary for six months following his termination date (increasing to twelve months if the

- 8 -

termination date follows the completion of this offering); and (ii) payment or reimbursement of continued health coverage for him and his dependents for a period of up to six months (increasing to twelve months if his termination date follows the completion of this offering), or a taxable lump sum payment in lieu of such payment or reimbursement, as applicable.

To receive the severance benefits upon a qualifying termination, Mr. McGuire must sign and not revoke our standard separation agreement and release of claims within the timeframe set forth in the policy. If we discover after he receives severance benefits that grounds for terminating him for cause existed, he will not receive any further severance benefits under the policy, and to the extent permitted by law, he will be required to repay to us any severance benefits (or gain from such benefits) he received under the policy.

If any of the payments provided for under the policy or otherwise payable to Mr. McGuire would constitute "parachute payments" within the meaning of Section 280G of the Internal Revenue Code and would be subject to the related excise tax under Section 4999 of the Internal Revenue Code, then he will be entitled to receive either full payment of benefits or such lesser amount which would result in no portion of the benefits being subject to the excise tax, whichever results in the greater amount of after-tax benefits to him. The policy does not require us to provide any tax gross-up payments to Mr. McGuire or any other participant.

40.     The Prospectus also made the following comparisons as to revenue growth at the Company, stating:

**Comparison of the Three Months Ended April 30, 2016 and 2017 Revenue**

*  *  *

Total revenue increased by $7.5 million, or 33%, from $22.9 million in the three months ended April 30, 2016 to $30.4 million in in [sic] the three months ended April 30, 2017.

*  *  *

Sales and marketing expense increased by $2.5 million, or 1.0%, from $25.0 million in the three months ended April 30, 2016 to $27.5 million in the three months ended April 30, 2017. The increase in sales and marketing expense was primarily due to increased sales commission and travel expenses of $1.4 million as a result of increased sales and expanded sales and marketing activities. In addition, as part of our efforts to penetrate and expand in global, markets, the cost of our marketing activities, including field events, advertising, tradeshows, brand awareness, demand generation and other expenses, collectively accounted for $0.8 million of the increase.

*  *  *

- 9 -

**Comparison of the Fiscal Years Ended January 31, 2016 and 2017 Revenue**

\* \* \*

Total revenue increased by $39.1 million, or 45%, from $86.0 million fiscal 2016 to $125.1 million in fiscal 2017.

\* \* \*

**Comparison of the Fiscal Years Ended January 31, 2015 and 2016 Revenue**

\* \* \*

Total revenue increased by $36.2 million, or 73%, from $49.8 million in fiscal 2015 to $86.0 million in fiscal 2016.

\* \* \*

Sales and marketing expense increased by $32.9 million, or 60%, from $55.1 million in fiscal 2015 to $88.0 million in fiscal 2016. The increase in sales and marketing expense was primarily driven by higher personnel costs of $11.1 million due to a 39%.headcount increase. Sales commission and travel expenses increased by $10.0 million due to increased sales, higher sales and marketing activities, and overhead costs increased by $4.7 million, primarily driven by depreciation of equipment in our sales demonstration program that we initiated at the start of fiscal 2016. In addition, as part of our efforts to penetrate and expand in global markets, the cost of our marketing activities, generally including field events, advertising, tradeshows, brand awareness, demand generation and other expenses, collectively accounted for $6.3 million of the increase.

41.     While the Registration Statement contained purported "warnings" about the risks involved in investing in Tintri stock, those disclosures themselves were false and misleading.  In particular, they stated:

> *If we are unable to attract and retain qualified personnel, our business and operating results could suffer.*
>
> Our future success also depends on our ability to continue to attract, integrate and retain highly skilled personnel, especially skilled sales and engineering employees. Competition for highly skilled personnel is frequently intense, especially in the San Francisco Bay Area where we are headquartered. We compete with many larger and better funded organizations both inside and outside of the storage industry for skilled personnel, and we may be unable to compete with the compensation and other benefits that these organizations offer to attract candidates and retain existing personnel.
>
> Volatility or declines in our stock price may also affect our ability to attract and retain key employees....

- 10 -

We cannot assure you that we will be able to successfully attract or retain qualified personnel. Any failure to successfully attract, integrate or retain qualified personnel to fulfill our current or future needs may negatively impact our growth and adversely affect our business, Operating results and financial condition.

* * *

**If we do not effectively expand and train our sales force, we may be unable to increase our revenue and our business will be adversely affected.**

Although we have a channel sales model, our sales representatives typically engage in direct interaction with our prospective customers. Therefore, we continue to be substantially dependent on our sales force to obtain new customers and sell additional solutions to our existing customers. As such, we have invested and will continue to invest substantially in our sales organization. Competition for sales personnel with the skills and technical knowledge that we require is intense and our ability to achieve significant revenue growth will depend, in large part, on our success in recruiting, training and retaining sufficient numbers of sales personnel to support our growth.

As a result of our recent growth, a large percentage of our sales force is new to our company and therefore less effective than our more seasoned sales personnel. New hires require significant training and may take significant time before they achieve full productivity; we estimate based on past experience that sales team members typically do not fully ramp and are not fully productive during the first several quarters of employment with us. Our recent hires and planned hires may not become productive as quickly as we expect Furthermore, hiring sales personnel in new countries requires additional set up and upfront costs that we may not recover if the sales personnel fail to achieve full productivity. If we are unable to hire and train sufficient numbers of effective sales personnel, or the sales personnel are not successful in Obtaining new customers or increasing sales to our existing customer base, our business, operating results and financial condition will be adversely affected.

* * *

**We rely on our key technical, sales and management personnel to grow our business, and the loss of one or more key employees could harm our business.**

Our success and future growth depends to a significant degree on the skills and continued services Of our key technical, sales and management personnel. In particular, we are highly dependent on the services of Ken Klein, our Chairman and Chief Executive Officer, and Kieran Harty, our co-founder and Chief Technical Officer, who are critical to the development of our technology, future vision and strategic direction. We rely on our leadership team in the areas of operations, security, marketing, sales, support and general and administrative functions, and on individual contributors on our research and development team. All of our employees are employed by us on an at—will basis, and we could

- 11 -

experience difficulty in retaining members of our senior management team or other key personnel. We do not have "key person" life insurance policies that cover any of our Officers or other key employees. The loss of the services of any of our key employees could disrupt our operations, delay the development and introduction of our solution and negatively impact our business, operating results and financial condition.

42. The statements described above were false and misleading because they failed to disclose and misrepresented the following adverse facts that existed at the time of the IPO:

(a) defendants knew or should have known that its sales force was the critical ingredient in the Company's revenue growth, as its sophisticated sales force had driven Tintri's impressive revenue growth as a private entity;

(b) defendants knew or should have known that the loss of key employees, particularly within its sales force, would cause significant harm to the Company and impede its revenue generation;

(c) defendants knew or should have known that the Company's strong sales force was about to be destroyed since defendants were unwilling to compensate its Chief Sales Officer, and that it was nearly certain he would leave the Company;

(d) defendants knew or should have known that the loss of the Company's Chief Sales Officer would result in many other top sales persons leaving as well;

(e) defendants knew or should have known that, without Mr. McGuire driving the sales force as he had in past, Tintri could not generate as much revenue as it had in the past, and certainly not in the short term, while defendant Klein tried to spearhead and build an entirely new sales department;

(f) As such, defendants knew or should have known that Tintri's financial projections and expectations were not achievable given the sales force disruption defendants knew or should have known was coming; and

(g) As a result, at the time of the IPO, the Company's business and financial prospects were not what defendants had led the market to believe they were in the Registration Statement.

- 12 -

43.     Approximately one and a half months after the IPO, Tintri lowered revenue and earnings per share guidance.  The Company explained that its Chief Sales Officer had left the Company and its sales organization had flattened.

44.     Just two months after the IPO, the Company disclosed that revenue came on the low end of its expectations.  In the ensuring earnings conference call, the Company's officers revealed that there was "sales attrition ... during and after the IPO."  Further, now that the Chief Sales Officer left, the Company had to increase its focus on "sales retention, training, and enablement as we launch our new product offerings."  During the conference call, defendants stated:

> [Analyst]: Yes, thanks. I know you haven't given guidance for Q4, just talked about some improving momentum toward the end of the year here. But if I roll through Q3 to Q4 and I assume some type of reasonable growth from Q3 to Q4 it's still going — it's like almost no growth year-over-year.
>
> How should we be thinking about the growth profile of the business at this point, I mean, you had talked about pre-IPO, like a 30% type growth. Obviously that is not going to be the case to the second half of the year and probably not in the first half of next year given the comps. So maybe just first, how do we think about growth at this point and then what has really changed to cause growth to stall out here?
>
> [Defendant Halifax]: ...So obviously the Q2 revenue was slightly lower than we hoped and Ken commented in his prepared remarks.
>
> As a result we're just been very focused on closing our guidance for Q3 and I wouldn't expect to see a strong return to growth in Q4. But for now we're simply guiding through the end of Q3, I'll break guidance for Q4 onto next quarter and then provide full year guidance for next year — at the end of the fiscal year.
>
> [Analyst]: Okay. That didn't really answer my question. I guess I'm trying to understand what — I know you're trying to be cautious because you had a weaker than expected Q2. But unless you're going to see like a dramatic pickup in the business I guess. What would cause a dramatic pickup in the business? And then maybe why —— why are things — I know you talked about the IPO but is there something else that's changed — the product cycle have a bigger impact, kind of ending of this product cycle before the new product cycle have a bigger impact than you expected what are other things going on here that have caused this sort of reset?
>
> [Defendant Klein]: Yes.... So the IPO actually had a profound impact on our business as I mentioned in my prepared remarks it definitely caused distraction,

- 13 -

disruption and some unwanted attrition particularly in the sales force. And so, as mentioned I've taken over, taking really the necessary steps to get it back on the right sort of growth trajectory platen the organization.

I'm focusing on sales processes, improving productivity and I have a really strong team reporting, Mr. Tom Ellery, running North America as X- EMC, Brocade and Tom Cashman running rest of world and Alliance of X-IBM. So the guidance is really just fundamentally due to taking a cautious posture given what we experienced in Q2.

*  *  *

[Analyst]: Yes. Thank you for taking the questions. You released in a K when the Chief Sales Officer left, but wonder if you could provide some color as to how many quota carrying sales reps you have? I think last quarter it was 70, did you also see some turnover in that base. Because I guess we're trying to reconcile a strong customer add number, I think you added 127 customers versus 90 the prior few quarters.

You're talking about strong land and expand. And so the metrics in the business look okay, but you're guiding revenue down 15% in October. I was just trying to understand what might be going on in the sales force beyond the head of that business leaving?

[Defendant Halifax]: Let me take the first part, okay. So we're not going to disclose the absolute number of sales teams or ramp sales team. What I can tell you that we did lose a small number of ramp sales team but having said that, the yield — the average yield per ramp team actually increased 33% year—over-year, so that we think is pretty healthy.

[Defendant Klein]: Yes. And then in terms of customer adds..., we added approximately 88 net new logos in the quarter. So it was pretty consistent with — sort of the customer add totals that we've experienced in previous quarters. And we have some nice new logos including we added Fox as a new customer, Bechtel, Volkswagen and Salvation Army are pleased with those adds.

[Analyst]: And then just as a follow-up, does that 33 % increase in average yield per ramp team does that include the contribution from some of the people that left during the quarter? And then just as a connected question to that why are you so confident that you can drive increased sales productivity to deliver growth whereas a lot of your other competitors in the emerging storage space are having to hire aggressively in order to deliver their growth. Why do you think Tintri is different? Thank you.

[Defendant Halifax]: ...The first part of the question there were some sales people, probably who were included in that 33%, yield number I gave you. So the answer now is yes. Second part is we're very focused on our land and expand model. As you can see the land and expand multiplier went to 21x last quarter

- 14 -

from 19x. So we believe that fundamentally we align the right enterprise account and expand there, we don't need to darken the skies with new sales people.

\* \* \*

[Analyst]: Yes. Thank you. What's your plan to add new sales teams and are you changing that I mean given the fact that your revenue trajectory looks materially different at least for the next quarter. What are you putting in place in terms of ramping because it also sounded as though you are going to cautiously manage your expenses? So are you putting expansion of sales teams on hold at the moment?

[Defendant Klein]: It's Ken. It's really a balancing act obviously where we see a TAM that we can access will add new teams. I'd say, that we're biased more toward productivity again as I mentioned I really flattened the organization, really three strong leaders here including a sales ops function as well. And we're very much focused on driving productivity because productivity is really going to be the key they gets us toward our cash and profitability goals in the longer—term.

So we're focusing on — primarily on things like sales process and really optimizing organization, kind of how we're doing things, how we're working with the channel and those sorts of things as opposed to just blindly adding teams.

[Analyst]: Okay. Thanks. As a follow-up, in your guidance can you help us parse through what your assumptions are so we can try to disaggregate what might be more transitory disruption around IPO and leaving your sales head versus anything much more structural?

Can you help us think through within the guidance what sort of repeat purchases are you accounting for is there a significant change in the deal size existing or new customers that you're embedding and acquisition of new customers. If you can help us think through these different pieces what your assumptions are embedded within your guidance I think it will be helpful to sort of characterize what is transitory versus not?

[Defendant Klein]: I'll try to take a swing and I'll let Ian follow—up. So it is really difficult to quantify last quarter, I mean — clearly retention bid [sic] us to certain degree but there was a fair amount of disruption and distraction, which is in fact transitory, so we believe we really stabilized the organization. And we've kind of move beyond a very difficult IPO. Again, as I mentioned, we installed very, very strong leaders in North America and in rest of world to really manage the business. And I'll turn the rest of the question over to Ian.

\* \* \*

[Analyst]: Just a question for Ken then I'll jump here at another potential disruption would be down the road kind or if you guys decided to bring in as head of global sales to replace Mike and that could lead to another attrition like event. Can you say right now that you really believe that, that's not the path forward here

- 15 -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1  in the next 24 to 36 months that the current shot here is what it is and that you're
moving forward with?

2
[Defendant Klein]: ...I have no plans at this time to change the structure from the
3  one that I just created. Again, just to reiterate, I thought I'd have a very strong
team Ian, both Tom Ellery and Tom Cashman and Ben Taft around sales
4  operations really supporting me in this.

5
Just as a reminder, I've run companies from the past add billion dollars from scale
6  from sales perspective. So it's not something that's foreign to me and actually it's
provided a unique opportunity to really align ourselves the field with headquarters
7  and headquarters of field are more — closely, more tightly and again that
alignment, I'm already seeing the signs of driving sort of faster velocity in terms
8  of decision making and I expect to see improved execution. So I'm comfortable
with the organization the model we have in place.
9

10     45.     The Company's stock price cratered. It now trades close to $3 per share, a fall of

11  nearly 60% from the IPO price.

12                        **CLASS ACTION ALLEGATIONS**

13     46.     Plaintiff brings this class action individually and on behalf of all persons who

14  purchased or otherwise acquired Tintri stock pursuant or traceable to the Registration Statement

15  issued in connection with the IPO (the "Class"). Excluded from the Class are defendants and

16  their families, the officers and directors and affiliates of defendants, at all relevant times,

17  members of their immediate families and their legal representatives, heirs, successors, or assigns,

18  and any entity in which defendants have or had a controlling interest.

19     47.     The members of the Class are so numerous that joinder of all members is

20  impracticable. While the exact number of Class members is unknown to plaintiff at this time and

21  can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds

22  of members in the proposed Class. Record owners and other members of the Class may be

23  identified from records maintained by Tintri or its transfer agent and may be notified of the

24  pendency of this action by mail, using the form of notice similar to that customarily used in

25  securities class actions.

26

27

28
                                              - 16 -

48.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law, as complained of herein.

49.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

50.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether defendants violated the Securities Act;

(b)    whether the Registration Statement and Prospectus were negligently prepared and contained inaccurate statements of material fact and omitted material information required to be stated therein; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

51.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## FIRST CAUSE OF ACTION

### Against Tintri, Individual Defendants, Underwriter Defendants, and Does 1-25 for Violation of Section 11 of the Securities Act

52.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

53.    This Cause of Action is brought pursuant to section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against Tintri, Individual Defendants, Underwriter

- 17 -

1 | Defendants, and Does 1-25.

2 |     54.    The Registration Statement contained untrue statements of material fact, omitted
3 | to state other facts necessary to make the statements made not misleading, and omitted to state
4 | material facts required to be stated therein.

5 |     55.    Tintri, Individual Defendants, Underwriter Defendants, and Does 1-25 are strictly
6 | liable to plaintiff and the Class for the misstatements and omissions.

7 |     56.    None of the defendants named herein made a reasonable investigation or
8 | possessed reasonable grounds for the belief that the statements contained in the Registration
9 | Statement were true and without omissions of any material facts and were not misleading.

10 |     57.    By reason of the conduct herein alleged, each defendant violated, and/or
11 | controlled a person who violated, section 11 of the Securities Act.

12 |     58.    Plaintiff acquired Tintri stock issued pursuant to the Registration Statement.

13 |     59.    Plaintiff and the Class have sustained damages. The value of Tintri stock has
14 | declined substantially subsequent to and due to defendants' violations.

15 |     60.    At the time of their purchases of Tintri stock, plaintiff and other members of the
16 | Class were without knowledge of the facts concerning the wrongful conduct alleged herein and
17 | could not have reasonably discovered those facts prior to the disclosures herein. Less than one
18 | year has elapsed from the time that plaintiff discovered or reasonably could have discovered the
19 | facts upon which this complaint is based to the time that plaintiff commenced this action. Less
20 | than three years has elapsed between the time that the securities upon which this Cause of Action
21 | is brought were offered to the public and the time plaintiff commenced this action.

## SECOND CAUSE OF ACTION

**Against Tintri, the Individual Defendants, Underwriter Defendants,
and Does 1-25 for Violation of Section 12(a)(2) of the Securities Act**

25 |     61.    Plaintiff incorporates by reference and realleges each and every allegation
26 | contained above, as though fully set forth herein.

27

28

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

62.    By means of the defective Prospectus, Tintri, Individual Defendants, Underwriter Defendants, and Does 1-25 promoted and sold Tintri stock to plaintiff and other members of the Class.

63.    The Prospectus for the IPO contained untrue statements of material fact and concealed and failed to disclose material facts, as detailed above. Tintri, Individual Defendants, Underwriter Defendants, and Does 1-25 owed plaintiff and the other members of the Class who purchased Tintri stock, pursuant to the Prospectus, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true, and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Tintri, Individual Defendants, Underwriter Defendants, and Does 1-25, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus as set forth above.

64.    Plaintiff did not know, nor in the exercise of reasonable diligence could plaintiff have known, of the untruths and omissions contained in the Prospectus at the time plaintiff acquired Tintri stock.

65.    By reason of the conduct alleged herein, Tintri, Individual Defendants, Underwriter Defendants, and Does 1-25 violated section 12(a)(2) of the Securities Act. As a direct and proximate result of such violations, plaintiff and the other members of the Class who purchased Tintri stock pursuant to the Prospectus sustained substantial damages in connection with their purchases of the stock. Accordingly, plaintiff and the other members of the Class who hold stock issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their stock to defendants sued herein. Class members who have sold their stock seek damages to the extent permitted by law.

**THIRD CAUSE OF ACTION**

**Against Tintri, the Individual Defendants, the Venture Capital Defendants,
and Does 1-25 for Violation of Section 15 of the Securities Act**

66.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

67.     This Cause of Action is brought pursuant to section 15 of the Securities Act against Tintri, Individual Defendants, Venture Capital Defendants, and Does 1-25.

68.     The Individual Defendants each were controlling persons of Tintri by virtue of their positions as directors and/or senior officers of Tintri.    Each of the Venture Capital Defendants controlled Tintri by their voting and dispositive control over greater than 20% of Tintri's outstanding voting shares and pre-IPO stockholder agreements.    The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major stockholders of Tintri.    The Company controlled the Individual Defendants, Does 1-25, and all of Tintri's employees.    The Venture Capital Defendants were control persons of Tintri by virtue of their ownership of Tintri stock and their rights to force Tintri to register that stock for resale.

69.     The Venture Capital Defendants had a financial interest in taking the Company's stock public in order to increase the holding value and marketability of the Venture Capital Defendants' investment in Tintri. Tintri, the Venture Capital Defendants, the Individual Defendants, and Does 1-25 were each critical in effecting the IPO, based on their signing or authorization of the signing of the Registration Statement, by voting (including voting their shares) to execute the IPO, and by having otherwise directed through their authority the processes leading to execution of the IPO.

70.     Tintri, the Individual Defendants, the Underwriter Defendants, and Does 1-25 were each culpable participants in the violations of sections 11 and 12(a)(2) of the Securities Act alleged in the First and Second Causes of Action above, based on their having signed or

- 20 -

1 | authorized the signing of the Registration Statement and having otherwise participated in the

2 | process which allowed the IPO to be successfully completed.

3 | **PRAYER FOR RELIEF**

4 |     WHEREFORE, plaintiff prays for relief and judgment, as follows:

5 |     A.      Under section 382 of the California Code of Civil Procedure, certifying this as a

6 | class action, appointing plaintiff as a Class representative under California Rule of Court 3.764,

7 | and appointing plaintiff's counsel as Class counsel;

8 |     B.      Awarding damages in favor of plaintiff and the Class against all defendants,

9 | jointly and severally, in an amount to be proven at trial, including interest thereon;

10 |     C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in

11 | this action, including counsel fees and expert fees;

12 |     D.      Awarding rescission or a rescissory measure of damages; and

13 |     E.      Awarding equitable, injunctive or other relief, including disgorgement or

14 | restitution, as deemed appropriate by the Court.

15 | **JURY DEMAND**

16 |     Plaintiff demands trial by jury.

17 | Dated: October 6, 2017                    ROBBINS ARROYO LLP
                                              BRIAN J. ROBBINS
18 |                                          STEPHEN J. ODDO
                                              ERIC M. CARRINO
19 |

20 |                                          *Brian J. Robbins* /penen ODD
                                             BRIAN J. ROBBINS
21 |
                                             600 B Street, Suite 1900
22 |                                          San Diego, CA 92101
                                             Telephone: (619) 525-3990
23 |                                          Facsimile: (619) 525-3991
                                             E-mail: brobbins@robbinsarroyo.com
24 |                                                  soddo@robbinsarroyo.com
                                                     ecarrino@robbinsarroyo.com
25 |
                                             Attorneys for Plaintiff
26 |

27 | 1213142

28 |
- 21 -
COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Brian J. Robbins (190264)<br>ROBBINS ARROYO LLP<br>600 B Street, Suite 1900<br>San Diego, CA 9101 | **FILED**<br>SAN MATEO COUNTY<br>OCT 6 2017<br>*Superior Court*<br>*COUNTY CLERK* |

TELEPHONE NO.: (619) 525-3990    FAX NO.: (619) 525-3991
ATTORNEY FOR *(Name):* Plaintiff Vladimir Golosiy

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Mateo
STREET ADDRESS: 400 County Center
MAILING ADDRESS:
CITY AND ZIP CODE: Redwood City, CA 94063
BRANCH NAME: Hall of Justice and Records

CASE NAME:
Golosiy v. Tintri, Inc., et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: 17CIV04618 |
|---|---|---|---|---|
| ☑ Unlimited (Amount demanded exceeds $25,000) | ☐ Limited (Amount demanded is $25,000 or less) | ☐ Counter  ☐ Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | | JUDGE:<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)

**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)

**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)

**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)

**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☑ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ☑ is  ☐ is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☑ Large number of separately represented parties
   b. ☑ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☑ Substantial amount of documentary evidence
   d. ☑ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. ☑ monetary  b. ☑ nonmonetary; declaratory or injunctive relief  c. ☐ punitive
4. Number of causes of action *(specify):* Three
5. This case ☑ is  ☐ is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: October 6, 2017

Brian J. Robbins
_____
(TYPE OR PRINT NAME)

▶ *Brian J. Robbins w/permission DOA*
_____
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007]

17 – CIV – 04618
CCCS
Civil Case Cover Sheet
752935

CIVIL CASE COVER SHEET

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
*www.courtinfo.ca.gov*

*File By Fax*

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
Damage/Wrongful Death
Uninsured Motorist (46) *(if the*
*case involves an uninsured*
*motorist claim subject to*
*arbitration, check this item*
*instead of Auto)*

**Other PI/PD/WD (Personal Injury/**
**Property Damage/Wrongful Death)**
**Tort**
Asbestos (04)
Asbestos Property Damage
Asbestos Personal Injury/
Wrongful Death
Product Liability *(not asbestos or*
*toxic/environmental)* (24)
Medical Malpractice (45)
Medical Malpractice–
Physicians & Surgeons
Other Professional Health Care
Malpractice
Other PI/PD/WD (23)
Premises Liability (e.g., slip
and fall)
Intentional Bodily Injury/PD/WD
(e.g., assault, vandalism)
Intentional Infliction of
Emotional Distress
Negligent Infliction of
Emotional Distress
Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
Practice (07)
Civil Rights (e.g., discrimination,
false arrest) *(not civil*
*harassment)* (08)
Defamation (e.g., slander, libel)
(13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
Legal Malpractice
Other Professional Malpractice
*(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
Breach of Rental/Lease
Contract *(not unlawful detainer*
*or wrongful eviction)*
Contract/Warranty Breach–Seller
Plaintiff *(not fraud or negligence)*
Negligent Breach of Contract/
Warranty
Other Breach of Contract/Warranty
Collections (e.g., money owed, open
book accounts) (09)
Collection Case–Seller Plaintiff
Other Promissory Note/Collections
Case
Insurance Coverage *(not provisionally*
*complex)* (18)
Auto Subrogation
Other Coverage
Other Contract (37)
Contractual Fraud
Other Contract Dispute

**Real Property**
Eminent Domain/Inverse
Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
Writ of Possession of Real Property
Mortgage Foreclosure
Quiet Title
Other Real Property *(not eminent*
*domain, landlord/tenant, or*
*foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal*
*drugs, check this item; otherwise,*
*report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
Writ–Administrative Mandamus
Writ–Mandamus on Limited Court
Case Matter
Writ–Other Limited Court Case
Review
Other Judicial Review (39)
Review of Health Officer Order
Notice of Appeal–Labor
Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.**
**Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
*(arising from provisionally complex*
*case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
Abstract of Judgment (Out of
County)
Confession of Judgment *(non-*
*domestic relations)*
Sister State Judgment
Administrative Agency Award
*(not unpaid taxes)*
Petition/Certification of Entry of
Judgment on Unpaid Taxes
Other Enforcement of Judgment
Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified*
*above)* (42)
Declaratory Relief Only
Injunctive Relief Only *(non-*
*harassment)*
Mechanics Lien
Other Commercial Complaint
Case *(non-tort/non-complex)*
Other Civil Complaint
*(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate
Governance (21)
Other Petition *(not specified*
*above)* (43)
Civil Harassment
Workplace Violence
Elder/Dependent Adult
Abuse
Election Contest
Petition for Name Change
Petition for Relief From Late
Claim
Other Civil Petition